**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

KATHERINE L. SMITH,

        Plaintiff,

v.                               Case No. 3:05-cv-1253-J-32HTS

AMERICA ONLINE, INC., etc., et al.,

        Defendants.

_____

## ORDER

### I.    BACKGROUND

This is a case of alleged sexual harassment by a supervisor of his subordinate in the workplace.  Katherine Smith filed a three count Amended Complaint against America Online, Inc. ("AOL") and Chris Britton alleging: 1) Count I - sex discrimination against AOL pursuant to a theory of hostile work environment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*; 2) Count II - the intentional tort of battery against Britton; and 3) Count III - negligent hiring, retention and supervision against AOL.  AOL moves for summary judgment on Counts I and III. After briefing, the Court heard oral argument on April 17, 2007.

### A.    Katherine Smith's Job at AOL

Taking all evidence in the light most favorable to Smith, on June 13, 2003, AOL hired Smith as a Saves Consultant ("consultant") in its Member Retention Department in the Jacksonville, Florida Call Center.  (Doc. 50, Smith Dep., p. 12).  The main

function of a consultant is to receive calls from customers who wish to cancel their AOL memberships and to change their minds.  (Smith Dep., pp. 80-82).  On August 11, 2003, Smith signed AOL's Business and Personal Conduct policy.  The policy provides, in pertinent part:

> If you commit any of the following actions, it will be considered grounds for immediate disciplinary action up to and including immediate termination of employment: ...15.  Harassment of any kind, which is defined as derogatory comments, inappropriate gestures, offensive visual material or hostile behavior that another individual finds offensive. Discrimination on the basis of race, religion, national origin, age, sex, sexual orientation, disability or any other personal characteristic will not be tolerated within the AOL Community.

(Smith Dep., pp. 67-69, Ex. 6).  Smith understood that if she was the victim of sexual harassment and was either uncomfortable asking the harasser to stop, or, if after asking, the harasser did not relent, she was required to report it to her supervisor or the Human Resources Department.  (Smith Dep., pp. 67-69, Ex. 6; Doc. 45, Conway Dep., Ex. 1).

Smith worked as a consultant with AOL until April 2004, when AOL promoted her to the position of Consultant Support Specialist ("CSS"), a newly created position. In fact, about that time, AOL restructured its Member Retention Department using a new concept called Team Works.  Under the Team Works model, a team consists of a Senior Coach, two Coaches, two or three CSSs and a number of consultants.  A CSS monitors the performance of the consultants, a Coach monitors the manner in which a CSS oversees his or her group of consultants and the Coaches and CSSs report directly to the Senior Coach; the Senior Coach has direct supervisory authority

over both the Coaches and the CSSs.  The Senior Coach reports to a Sales Service Manager.  (Doc. 42, Stephen McCann Dep., pp. 8-11).

Smith worked as a CSS with fellow employees Patty Carter and Sue Hall.  The Coaches on their team were Stephen McCann and Ashley Salinas.  The Senior Coach was Britton, the alleged harasser.  Britton's Team Works team worked a shift of Saturday through Wednesday from 6:00 a.m. to 4:30 p.m.  Team members worked eight hour shifts spanning that period; Smith's typical work schedule was 7:15 a.m. to 4:15 p.m.  (McCann Dep., pp. 8-11; Smith Dep., pp. 86-89).  As a CSS, Smith interacted with the Coaches and Senior Coach on a daily basis to improve overall team performance.  (Smith Dep., pp. 92-98).

### B.    Smith's Interactions with Britton

Britton made it a point to socialize with his team outside the office.  The team (Senior Coach Britton, Coaches Ashley Salinas and Stephen McCann and CSSs Patty Carter and Katherine Smith) met at least four times after work to socialize in May and June of 2004.  On three of the four occasions, they met at Dave & Busters, Sneakers Bar & Grill and Motoga's Japanese Restaurant.  Smith brought her partner, Raychael Harkey, to the outing at Motoga's so that she could meet Smith's co-workers.  (Smith Dep., pp. 127-128).  Britton did not act inappropriately during these outings.  (Smith Dep., pp. 130-131).  The fourth outing was to the Regency Theater to view the movie Spiderman.  The management team invited the consultants to this outing.  (Smith Dep., p. 129).  After the movie, Britton approached Smith and Harkey

-3-

and asked them if they wanted to go to the Ale House with the group.  During this interaction, looking in the direction of both Smith and Harkey, Britton said "Damn, you clean up good."  (Smith Dep., p. 131; Doc. 43, Harkey Dep., pp. 55-56).  Smith understood the comment was directed at her; however, Harkey perceived that Britton was speaking to her.  (Smith Dep., p. 131; Harkey Dep., pp. 55-56).

Smith described four other incidents involving Britton that occurred over the period of a month.  First, on July 6, 2004, Britton walked by Smith's desk while she was peeling an orange and told her that he would "like to eat those oranges off your body."  Smith replied, "That is so gross.  Don't talk to me like that." (Smith Dep., pp. 135-136, 155-156).  Second, on July 24, 2004, Smith went into the copy room because Britton had asked her to copy some documents.  While Smith was making the copies, she turned around and Britton was standing very close to her.  Britton grabbed her belt loops and pulled her waist toward his waist.  After Smith asked "What are you doing?," Britton said "Give me a hug."  Smith then said "No, Chris" and placed her hand on his chest and pushed him away.  (Smith Dep., pp. 136-138, 156-157).

Third, on August 2, 2004, Britton invited Smith to a Ruby Tuesday restaurant after work.  Smith understood that they would be discussing work.  At the end of the work day, Smith and Britton departed for Ruby Tuesday; they drove separately.  Smith arrived first and chose a table at the front of the restaurant near the hostess stand.  Smith, who was apprehensive about the meeting, asked the server, Joshua

Self, to come to the table once Britton arrived and to act like he knew her.  Smith explained that she did that so if Britton thought Self knew her, Britton "would be less apt to do anything."  (Smith Dep., pp. 159-162, 165-187).

When Britton arrived, Self played his role and then took their order.  According to Smith, Britton started the conversation by saying "Katherine, I know that I'm not always professional with you," to which Smith responded, "No, Chris, you're not;" then, Britton proceeded to explain to Smith that he wished he could talk to his wife about having an "open marriage."  Smith testified that she continually tried to bring the conversation back to work; she knew Britton's team was performing poorly.  While Britton did discuss his frustration with his team, he apparently kept making comments about wanting to have an open marriage.  (Id.).

After approximately twenty or thirty minutes, Britton told Smith that he had to go pick up his kids and they proceeded together to the parking lot. Smith testified that as she unlocked her car door and attempted to get in her car, Britton grabbed her arm and attempted to hug her.  Smith placed her arms in a defensive position and asked "What are you doing?"  Britton responded "Just give me a hug," to which Smith responded "No."  Then, Britton said, "Well, give me a kiss then."  Smith began moving her head side to side to avoid a kiss and explained that Britton ended up kissing the side of her face.  (Id.).

When Britton and Smith exited the restaurant, the waiter (Joshua Self) was standing by the hostess stand at the front of the restaurant and saw Smith getting into

her car.  Self testified that it appeared to him that Smith and Britton were standing close to each other on the inside of the open front driver side door and that Smith was "trying to get in the car."  Viewing Self's affidavit and deposition testimony in concert illustrates that he is not clear as to what he saw next.  (Doc. 49, Self Dep., pp. 21-44, Ex. 1).  However, when AOL's counsel asked "When the gentleman (Britton) and Ms. Smith were at the car, you didn't see him actually kiss her, is that correct?," Self responded "No. No." (Self Dep., pp. 44).  In addition, after Self saw Smith and Britton standing inside the driver side door of Smith's car, Self exited the front doors of the restaurant to wave good-bye to Smith.  Once he was outside, Britton was walking away from Smith's car and Smith was inside her car preparing to drive away.  (Self Dep., pp. 21-44).

Smith left the parking lot and drove back toward AOL.  When Smith reached a stop light near AOL, Britton pulled up next to her and said he no longer had to pick up his kids from day care and that he had more time to "hang out."  Smith declined. Britton and Smith drove their separate ways.  (Smith Dep., pp. 186-187).

The following morning (August 3, 2004), Smith went to work and attended a scheduled meeting.  After the meeting, Smith approached Ashley Salinas (a Coach on Chris Britton's team) and told him what had occurred at Ruby Tuesday the day before. (Smith Dep., pp. 191-192).  Salinas advised Smith that she needed to inform AOL's Human Resources Department immediately.  Smith responded that (1) she

was not inclined to go to HR and would just rather wait until the next shift bid[1] to move off of Britton's team, and (2) she did not want to make a big issue of it and just wanted the whole issue to "go away."  (Id.).

After Smith concluded her conversation with Salinas, she went to Britton's office to discuss a work-related issue.  This is when the fourth incident occurred.  Smith approached Britton's desk and they proceeded to discuss work.  Then, as Smith turned to walk away, Britton summoned her back and as she approached and bent down to hear what Britton was going to say, he looked down her blouse and said "I like your new position."  (Smith Dep., pp. 198-200).  Smith immediately left Britton's office.  (Id.).

**C.    Human Resources Investigation**

Immediately after Smith's conversation with Salinas, Salinas shared what Smith told him with his fellow Coach Stephen McCann.  That same morning, Salinas and

---

[1]    Shift bids occur every six months at AOL under the Team Works model.  From six month period to six month period, it is not guaranteed that the shift of Senior Coaches, Coaches and CSSs will remain the same.  The shift bid process is designed presumably to provide incentives for good performance at all levels of Team Works so that employees at the various levels can achieve their desired work schedule in the twenty-four hour per day, seven days per week Jacksonville Call Center.  Prior to the shift bid process, each Senior Coach, Coach and CSS is graded based on similar criteria and then ranked according to their grades.  Then each Senior Coach, starting with the highest ranked Senior Coach, bids for a shift.  Once all Senior Coaches bid, the Coaches bid according to their rank, starting with the highest rated Coach.  Then, the CSSs go through the same process.  The format works so that once it comes time for the CSSs to bid, they know who the Senior Coach and Coaches are for each shift and the time slots for each shift.  (Doc. 37-3, Christopher Carr Aff.; Doc. 37-9, Jeremy Moore Aff.)

McCann reported what Smith had told them to Human Resources Director Jenna Svela and HR employee Seth Conway.  (McCann Dep., pp. 29-31; Doc. 51, Salinas Dep., pp. 30-33; Doc. 45, Svela Dep., pp. 67-68).  After meeting with Salinas and McCann, Svela and Conway called Smith into Svela's office and they all met for approximately thirty minutes.  (Smith Dep., pp. 202).  Smith told Svela and Conway about the Ruby Tuesday incident, Britton's comment about the oranges and that Britton looked down her shirt earlier that day.  (Smith Dep., pp. 202-203; Svela Dep., pp. 72-73, Ex. 6).  Smith did not mention the incident in the copy room or the comment Britton made at the movies.  Further, it is undisputed that other than what Joshua Self witnessed at Ruby Tuesday, there were no witnesses to the incidents Smith mentioned to Svela.

At the conclusion of Smith's conversation with Svela and Conway, Svela proposed that Smith take the rest of the day off with pay so that she did not have to work with Britton during the remainder of the investigation; Smith went home.  (Smith Dep., pp. 209-211; Svela Dep., p. 73).  Svela then called Britton into her office.

Britton denied that he had made any advances toward Smith or that Smith told him that he made her feel uncomfortable.  Britton denied trying to kiss Smith outside of Ruby Tuesday, but admitted that he gave her a hug stating that it was customary for Smith to hug him and others on their team.  (Svela Dep., p. 78-79; Doc. 47, Britton Dep., pp. 150-151).  Britton admitted to telling Smith earlier that day "I like your new position," but stated that Smith took his comment entirely out of context.  Britton

testified that even after asking Smith to come close to hear what he was going to say and admitting that she was wearing a V-neck top at the time, Britton's comment was directed toward the incentive program she pitched to her team earlier that day and that she was being more assertive and helpful to the team, rather than remaining in the background.[2]  (Britton Dep., pp. 140-143).

When Svela questioned Britton as to why he took Smith to Ruby Tuesday the previous day, Britton explained that they met there to discuss Smith's poor performance, specifically that consultants were complaining to him that Smith refused to take escalation calls and that she did not give them constructive feedback.  Britton further explained that he determined an "off site" meeting was appropriate because in the past when he had approached Smith at work about her performance problems, she would become emotional; thus, Britton thought it would be best if he counseled her somewhere away from the office.  (Britton Dep., pp. 121-125, 143-145; Svela Dep., pp. 78-79).

After interviewing both Smith and Britton, Svela determined that this situation was entirely "he said/ she said."  Following consultations with other management personnel, Svela decided that she could not reprimand (other than a verbal warning)

---

[2]     Britton testified that when he said "I like your new position" to Smith, Smith gave him "a look," and he immediately exclaimed that he did not mean the comment in a sexual manner.  (Britton Dep., p. 140, 143).  Smith did not recall Britton offering any explanation after making the comment.  (Smith Dep., p. 199).

or terminate Britton.[3]  (Svela Dep., pp. 107-109; Britton Dep., p. 148).  Svela did not contact Joshua Self as Smith never told her that Self may have witnessed any illicit behavior.  Further, Smith never presented Svela with any witnesses to any of Britton's alleged harassing conduct.  (Svela Dep., pp. 95-96).

When Svela concluded the investigation and determined the available CSS positions on other teams, she approached Smith with five options: 1) a CSS position on the 8:30 a.m. - 5:30 p.m. (Monday - Friday) shift on Ty Boler's team; 2) a CSS position on the 2:00 p.m. - 11:00 p.m. (Saturday - Wednesday) shift on Paul Brady's team; 3) a CSS position on the 12:00 p.m. - 9:00 p.m. (Monday - Friday) shift on Stacia Smith's team; 4) remain on Chris Britton's team and keep the same hours; or (5) return to working as a consultant on any team while keeping the same pay and benefits as a CSS.  Smith informed Svela that none of those options were "acceptable" to her (primarily because the changed schedules conflicted with her child care concerns).  Later, Svela informed Smith that in the interim she learned that the available CSS hours on Ty Boler's team were now 10:00 a.m. to 7:00 p.m. (Monday - Friday).  After accepting the revised hours on Ty Boler's team among the available options, Smith told Svela that she would be at work the following Monday at 10:00 a.m.  Instead, Smith arrived that Monday and tendered a letter of resignation to Svela. (Svela Dep., pp. 97-102; Smith Dep., 214-216, 223, Ex. 10).

---

[3]  Svela verbally warned Britton that if she ever heard of any such complaints again that he would be reprimanded up to and including termination. (Svela Dep., pp. 102-103, 107-09; Britton Dep., p. 148).

**D.     Prior Incidents**

There are two other incidents Smith brings to the Court's attention.   Both occurred before Smith began working for AOL.   The first pertains to an unidentified female employee who informed former Human Resources Manager Dan Martella that Britton had asked her out on a date. (Doc. 37-8, Martella Aff.).   The employee did not claim Britton was harassing her; she merely sought counsel about how to appropriately inform Britton she was not interested.   After Martella counseled the employee to tell Britton she was not interested in anything other than a professional relationship, the employee made no further complaints concerning Britton.   At no point did the employee tell Martella she felt Britton was harassing her.   (Id.).

The second incident involves former AOL employee Angela Walker.   Walker testified that Britton gave her compliments on her appearance and asked her out on several occasions.   Walker informed Jeff Martin, her supervisor and a Manager in Human Resources, of this.   Walker testified, however, that Britton never harassed her, nor was he even "pushy."   Walker ultimately informed Britton in an instant message that she wanted to keep their relationship on a professional level, and, after that conversation, Britton never asked her out again.   Walker did not request Martin to speak with Britton, and she did not expect him to do so.   (Doc. 54, Walker Dep., pp. 7-14, 27).

## II.     APPLICABLE STANDARDS

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986).  In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor.  Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

## III.    DISCUSSION

### A.     Hostile Work Environment Sexual Harassment (Count I)

Sexual harassment is a form of sex discrimination prohibited by Title VII. Gupta v. Florida Board of Regents, 212 F.3d 571, 582 (11th Cir. 2000) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).  Actionable sexual harassment occurs when inappropriate sexual conduct causes a hostile work environment that is sufficiently severe or pervasive to alter the terms and conditions

of work.  Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1245 (11th Cir. 2004).

Under Title VII, to support a hostile work environment claim against an employer, a plaintiff must establish that: (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors or other conduct of a sexual nature; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) a basis for holding the employer liable.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

### 1.    Whether Britton's conduct was severe or pervasive

At issue here is whether the alleged harassment was sufficiently severe or pervasive to constitute actionable sexual harassment and whether there is a basis to hold AOL liable for Britton's actions.[4]  In Gupta, the Eleventh Circuit noted that the "severe or pervasive" analysis "is the element that tests the mettle of most sexual harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere 'general civility code.'" 212 F.3d at 583 (quoting Faragher v. City of Boca Raton, 424 U.S. 775, 788 (1998)).  Thus, "a plaintiff must establish not only that she subjectively perceived the

---

[4]    Importantly, this motion does not raise the issue of Britton's own personal liability.  Britton did not move for summary judgment as to the Count II battery claim against him.

environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive." Gupta, 212 F.3d at 583 (citations omitted).

There is no dispute that Katherine Smith subjectively perceived her work environment with Chris Britton as hostile and abusive. The critical inquiry therefore is whether, from an objective viewpoint, the alleged sexual harassment was so frequent, severe or pervasive so as to constitute actionable sexual harassment. See id. There are four factors the Eleventh Circuit considers to determine if comments or actions of a sexual nature are sufficiently severe or pervasive to alter an employee's terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246. "[In hostile environment cases] [t]he courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive...." Id. (citations omitted).

As previously set forth, Britton's alleged harassing conduct spanned approximately one month (July - August 2004) and consisted of: (1) Britton's comment to either Smith or Raychael Harkey at the movies "Damn, you clean up good;" (2) Britton's comment that he would "like to eat those oranges off [Smith's] body;" (3) Britton's action of pulling Smith close to him by her belt loops at the copy machine; (4)

Britton's attempt to hug and kiss Smith in the Ruby Tuesday parking lot; and (5) Britton's comment to Smith "I like your new position."[5]

To determine if this conduct is of the ilk of cases that meet the severe or pervasive standard, it is instructive to survey Eleventh Circuit and other cases falling on both sides of the proverbial line.  Compare Gupta, 212 F.3d at 584-586 (trial court should have granted judgment as a matter of law to defendant because the following alleged conduct by a male department coordinator at a university (Rhodd) directed toward a female associate professor (Gupta) over a six or seven month period was not sufficiently severe or pervasive from an objective view: (1) flirtatious comments such as "[you are] looking very beautiful;" (2) frequent calls to her house at night asking personal questions such as "Are you in bed yet?," "I was wondering how you were doing?," and "Are you talking to your boyfriend?;" (3) one incident when Gupta entered Rhodd's office when he was expecting her and she found him sitting in his

---

[5]   Smith raises one other incident in her response claiming that it contributed to the hostile work environment Britton created.  However, it is of little or no import to the analysis.  It occurred some time after Smith and Harkey attended the movie with Britton's team.  Smith took a vacation day and went to Joe's Crab Shack with Harkey. On their way there, Britton called to ask what she was doing.  Smith told him that she and Harkey were going to the restaurant and Britton responded that he may meet them there after he finished some chores.  Smith told him she was unsure how long they would be there (trying to dissuade him from meeting them).  Britton arrived at the restaurant and had a couple of drinks with Smith and Harkey.  He apparently seemed agitated that Smith had invited someone else to the table to join them, but never said anything about it.  He did not make any inappropriate comments and left when Smith and Harkey left.  (Harkey Dep., pp. 50-54; Smith Dep., pp. 305-307).  While Britton inviting himself to have lunch with Smith and Harkey was probably annoying to them, it does not contribute to any sexually harassing hostile work environment.  See Gupta, 212 F.3d at 585.

chair with his dress shirt off (but wearing an undershirt) and he "unbuckled his belt and pulled down his zipper and started tucking his shirt in;" (4) one incident where Rhodd placed his hand on Gupta's inner thigh; and (5) one incident where Rhodd lifted Gupta's dress about four inches, felt the hem and said "What kind of material is that?"), Mendoza, 195 F.3d at 1247-1253 (finding that over an eleven month period, supervisor's "constant" following of employee and staring in a "very obvious fashion," two instances of making a sniffing sound while looking at the employee's groin area and another instance of sniffing without looking at the groin area, one incident of rubbing up against the employee's hip while touching her shoulder and smiling, and one incident where the supervisor made the comment that he was "getting fired up too" when the employee came into his office to exclaim that she was only there to work (and not to be harassed), fell well short of conduct that would be deemed sufficiently severe or pervasive to alter conditions of employment), Hockman v. Westward Comms., LLC, 407 F.3d 317, 328-29 (5th Cir. 2004) (actions of a co-worker toward plaintiff over a year and a half period were not sufficiently severe or pervasive to satisfy the objective standard: (1) commenting to plaintiff about a co-worker's behind and body; (2) once slapping plaintiff on the behind with a newspaper; (3) brushing up against plaintiff's breasts and behind while passing her; (4) one incident of holding her cheeks and trying to kiss her; (5) asking plaintiff to come to the office early so that they could be alone; and (6) one incident of standing in the doorway to the bathroom while plaintiff was washing her hands), Quinn v. Green Tree Credit

Corp., 159 F.3d 759, 768 (2d Cir. 1998) (summary judgment affirmed for employer where supervisor told plaintiff she had been "voted the 'sleekest ass' in the office" and on another occasion "deliberately touched [her] breasts with some papers that he was holding in his hand"), and Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993) (plaintiff's claims that supervisor repeatedly told plaintiff how beautiful she was, asked her out on dates, then when rebuffed told plaintiff she was a "dumb blonde" when she made mistakes counting inventory, tried to kiss her at a bar as well as two other times, placed "I love you" signs in plaintiff's work area and touched her shoulder at least six times, were insufficient to establish actionable sexual harassment)[6], with Hulsey, 367 F.3d at 1247-1249 (employee of fast food restaurant presented enough evidence for a jury to conclude that the following conduct of her male supervisor over a two to three week period was objectively severe or pervasive: (1) multiple direct and indirect proposals for sex; (2) repeated attempts to touch her breasts, place his hands down her pants or pull off her pants; (3) following her into the bathroom; and (4) enlisting help from others while he attempted to grope her), Johnson v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501, 506-07, 509 (11th Cir. 2000) (radio co-host who also served as

---

[6]    Plaintiff says Seventh Circuit precedent is not persuasive in the Eleventh Circuit in sexual harassment cases; however, the Eleventh Circuit has previously cited with approval Seventh Circuit precedent on the "severe or pervasive" issue.  See Gupta, 212 F.3d at 585 (citing Minor v. Ivy Tech State College, 174 F.3d 855, 858 (7th Cir. 1999)); Mendoza, 195 F.3d at 1246-47 (citing Bakersville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995), and Weiss, 990 F.2d at 337).

plaintiff's supervisor engaged in conduct that was sufficiently severe or pervasive to fall within objective sexual harassment when in a four month period he, among other things, repeatedly told plaintiff she had a sexy voice, called out plaintiff's name and pulled his pants up in an obscene manner so plaintiff could see the imprint of his private parts, repeatedly attempted to massage plaintiff's shoulders against her wishes, stuck his tongue out in an obscene manner, rubbed his "body parts" against plaintiff and commented about sex to plaintiff and asked her about her sex life), Dees v. Johnson Controls World Serv., Inc., 168 F.3d 417, 418, 422 n. 12 (11th Cir. 1999) (actions of Fire Chief and Assistant Chief and two other supervisory personnel toward plaintiff on a daily basis over about a three year period including sexually explicit jokes, comments about her body, requests to sit on their laps - and on one occasion when plaintiff refused, the Assistant Chief picking her up and squeezing her so hard she urinated in her pants, one occasion where one of the supervisors ground his groin into plaintiff's buttocks while stating "look at that sexy mama, I could just eat you in that skirt," multiple propositions for sex and repeated incidents of grabbing and slapping plaintiff's buttocks and leg, were sufficiently severe or pervasive), Splunge v. Shoney's, Inc., 97 F.3d 488, 490 (11th Cir. 1996) (pervasive hostile environment existed where four managers of restaurant "grabbed Plaintiffs, commented extensively on their physical attributes, showed them pornographic photos and videotapes, offered them money for sex, favored other employees who had affairs with them, [and] speculated as to the plaintiffs' sexual prowess..."), and Schiano v.

Quality Payroll Sys., Inc., 445 F.3d 597, 601-03,608 (2d Cir. 2006) (reversing district court's grant of summary judgment and holding a reasonable jury could conclude that vice president of company's actions toward employee over a five month period of repeatedly telling her that if she wanted a raise she was "sleeping with the wrong employee," at an office party in the presence of other employees placing his hand on employee's upper thigh and taking a picture of himself doing it, asking if the employee would go with him to his hotel room after the party, and, on several occasions, approaching plaintiff from the back while she was working and placing his hands on her back, neck and shoulders, was objectively severe or pervasive).

When considering the totality of the circumstances here, the Court deems that this case falls more in line with the Eleventh Circuit's decisions in Gupta and Mendoza rather than Hulsey, Johnson, Dees and Splunge. The four primary incidents were boorish, inappropriate and, if proven, potentially actionable against Britton individually; however, they were not sufficiently severe or pervasive to be actionable against AOL under prevailing precedent. While it is not the Court's intent to condone or trivialize these incidents, the Court must take an objective view as to whether these acts cross the line into the realm of actionable sexual harassment against AOL pursuant to the Eleventh Circuit's articulated standards. My judgment is that these incidents, viewed in toto, do not cross that line and that there is no factual issue for a jury to decide.

2.    **Faragher/Ellerth affirmative defense**

Even assuming *arguendo* that Smith has created a material issue of fact on her sexual harassment claim, AOL may also avail itself of the affirmative defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775, 805-807 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 764 (1998).  "The [affirmative] defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.  "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Id.

Thus, whether a tangible adverse employment action occurred is the threshold issue as to whether the Faragher/Ellerth defense is even available.  Smith claims she was constructively discharged when AOL offered her five alternatives: (1) working from 10:00 a.m. to 7:00 p.m. (Monday - Friday) on Ty Boler's team; (2) working 2:00 p.m. to 11:00 p.m. (Saturday - Wednesday) on Paul Brady's team; (3) working 12:00 p.m. to 9:00 p.m. (Monday - Friday) on Stacia Smith's team; (4) keeping her current schedule on Chris Britton's team until the upcoming shift bid; or (5) keeping her same hours, pay and benefits working as a consultant (rather than a CSS) on another team. Smith testified that she ultimately reported to work the following Monday and tendered

her resignation because none of those options were "acceptable," and that she was constructively discharged.

"[T]o establish 'constructive discharge,' the plaintiff must ... show that the abusive working environment became so intolerable that her resignation qualified as a fitting response. ...[The Faragher/Ellerth] affirmative defense will not be available to the employer ... if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004).

The Eleventh Circuit recently addressed a situation similar to that at issue here. In Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287 (11th Cir. 2007), the employer offered to transfer an employee who claimed to have suffered workplace harassment that the employer was unable to corroborate.  The Court held on the issue of constructive discharge that "[a]n offer to transfer an employee ... is not an employment action; it is merely an offer.  Providing an employee with a choice about where she works does not change the terms or conditions of employment." Baldwin, 480 F.3d at 1300.  Baldwin involved multiple offers to transfer the employee to another company location keeping the same job, pay and benefits; this case involves the option to transfer to other shifts on another team with the same pay and benefits. The undersigned sees no meaningful distinction between the two situations.  If Smith

-21-

could establish on these facts that she suffered a constructive discharge after merely being presented with these options, this would set an exceedingly low bar for adverse employment actions, one that is not endorsed by controlling precedent.  Thus, as a matter of law, Smith suffered no tangible adverse employment action.[7]

Further, AOL exercised reasonable care to prevent and correct promptly any sexually harassing behavior.  First, AOL maintains a sexual harassment policy which provides alternative avenues for reporting should an employee be harassed.  Smith admits that upon starting her employment with AOL she received a copy of this policy and understood the reporting alternatives.  (Smith Dep., pp. 67-69, Ex. 6; Conway Dep., Ex. 1).  Second, the same day that Human Resources Director Jenna Svela learned of Smith's complaints concerning Britton, she interviewed both Smith and Britton and determined that, because Smith could not corroborate any of her claims and Britton denied them, nothing other than a verbal warning to Britton was

---

[7]   That Smith's work schedule was not guaranteed to remain the same because of the "shift bid" process at AOL, which occurs every six months, lends further support to this finding.  The next shift bid after Smith's August 2004 resignation was set for one month later (September 2004).  The new shifts were to take effect in October 2004.  Because Smith was not one of the top performing CSSs, it was certainly not a foregone conclusion that she would keep her same work hours.  (Doc. 37-3, Christopher Carr Aff.; Doc. 37-9, Jeremy Moore Aff.).  Smith even admitted that when she began her employment at AOL, she filled out a form acknowledging that AOL was a 24 hour per day, 7 day per week call center and that she would be available to work "evenings, weekends, and holidays as needed."  (Smith Dep., pp. 59-60).  Smith also admitted that upon hire she was aware of the shift bid process, that it would occur every six months, and that had her shift changed because of the shift bid process she would have made the necessary adjustments to account for child care concerns.  (Smith Dep., pp. 63-65).

appropriate.[8]

Plaintiff assails Svela's investigation because it took a maximum of three hours and she did not interview Self (the Ruby Tuesday waiter).  In <u>Baldwin</u>, the Eleventh Circuit articulated the standard on this very issue:  "[a]ll that is required of an investigation is reasonableness in all of the circumstances, and the permissible circumstances may include conducting the inquiry informally in a manner that will not unnecessarily disrupt the company's business, and in an effort to arrive at a fair estimate of truth."  480 F.3d at 1304.  Even viewing the facts in the light most favorable to Smith, the Court finds Svela's investigation reasonable as a matter of law.[9]  Svela acted promptly and individually interviewed both Smith and Britton and, in essence, was forced to make a determination entirely based on a "he said/ she said" situation.  Even had Svela interviewed Self, Self's testimony shows that the most he could have potentially testified about was what Smith said to him upon arriving at the restaurant and that he thinks he may have seen Britton and Smith hug as they departed the parking lot.

_____

[8]    The verbal warning to Britton was that if Svela heard any additional complaints about him, he would be reprimanded further, up to and including termination.

[9]    In making this determination, the Court is guided by the Eleventh Circuit's admonition in <u>Baldwin</u> that "[t]o second guess investigations on grounds like [those presented] would put us in the business of supervising internal investigations conducted by company officials into sexual harassment complaints.  We already have enough to do, and our role under the <u>Faragher</u> and <u>Ellerth</u> decisions does not include micro managing internal investigations.   Instead, we look only to the overall reasonableness of the investigation under the circumstances...."  480 F.3d at 1304-1305.

Even assuming arguendo some deficiencies in AOL's investigation, in Baldwin, the Eleventh Circuit held that "even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the defense is still available if the remedial result is adequate." Baldwin, 480 F.3d at 1305 (citing Walton, 347 F.3d at 1288). Here, the Court views the remedial result as reasonable. After being unable to verify Smith's claims, Svela told Britton that if there were any more complaints about him, he would be subject to formal discipline up to and including termination. See Baldwin, 480 F.3d at 1306 ("[b]ecause warning the harasser and counseling him ordinarily is enough where the employer is able to substantiate the allegations, it certainly follows that the same remedy is enough when it is not able to do so"). While there was perhaps no formal warning documented in Britton' personnel file, Svela communicated to Britton that if there was even a further complaint, it could result in his termination. More importantly, AOL gave Smith four reasonable options (five, if you include continuing to work on Britton's team for one more month until shift bids) to address Smith's concerns about working with Britton.

The Court further finds that Smith unreasonably failed to take advantage of the AOL sexual harassment policy's preventive and corrective opportunities.[10] The Court

_____

[10]   Smith testified that Britton had consistently discouraged her from ever going to Human Resources about any matter because it could hurt her career. Moreover, it is understandable that Smith preferred not to "make waves" about Britton's conduct. However, this is the difficult choice that an employee faces if the employee believes he or she is being harassed in the workplace. "While we have recognized that filing a sexual harassment complaint may be uncomfortable, scary or both, we have also explained that, the problem of workplace discrimination ... cannot be [corrected]

agrees with AOL that even though Britton's alleged acts occurred over a short period of time, had Smith immediately reported the comment about the oranges or the alleged battery at the copy machine, the remaining incidents could have been avoided.[11]

Thus, even if the Court were to find Britton's alleged actions constituted severe or pervasive harassment that altered Smith's working conditions, AOL, as a matter of law, is entitled to the benefit of the Faragher/Ellerth defense to defeat vicarious liability.  Summary judgment is due to be granted to AOL on Smith's hostile work environment claim.

## B.    Retaliation

In the motion for summary judgment, AOL addresses a claim for retaliation to the extent plaintiff alleges such a claim in the Amended Complaint (Doc. 20) based on the assertions that AOL constructively discharged Smith.  In response, Smith indeed claims that she asserts a retaliation claim in Count I of the Amended Complaint.  The Court assumes arguendo that Smith states such a claim in Count I

_____

without the cooperation of the victims.  The Faragher and Ellerth decisions present employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it to the employer, or lose the opportunity to successfully prosecute a Title VII claim based on the harassment." Baldwin, 480 F.3d at 1307 (internal citations and quotations omitted).

[11]   Interestingly, once Smith's complaint was brought to Svela's attention and Svela interviewed Smith, Smith did not mention the alleged copy machine incident (which appears to have been the most egregious).

and addresses the retaliation claim on the merits.  To establish a retaliation claim, a plaintiff must show that:  (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal relationship between the two events.  Johnson, 234 F.3d at 507 (citation omitted).  For the reasons previously discussed, Smith did not suffer a tangible adverse employment action; thus, her retaliation claim fails.

### C.    Negligent Hiring, Retention and Supervision (Count III)

AOL seeks summary judgment on Smith's claim that AOL negligently retained or supervised Britton.  Under Florida law, "negligent supervision and retention occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicates his unfitness and the employer fails to take further action such as investigation, discharge, or reassignment." Martinez v. Pavex Corp., 422 F. Supp.2d 1284, 1298 (M.D. Fla. 2006) (citing Watson v. City of Hialeah, 552 So. 2d 1146, 1148 (Fla. 3d DCA 1989)).  A claim for negligent training, supervision and retention "must be based on an injury resulting from a tort which is recognized under common law."  Scelta v. Delicatessen Support Services, Inc., 57 F. Supp. 2d 1327, 1348 (M.D. Fla. 1999). Florida law does not recognize a common law claim of sexual harassment as an independent tort.  See id.; Castleberry v. Edward M. Chadbourne, Inc., 810 So. 2d 1028, 1030 (Fla. 1st DCA 2002).

Here, Smith's only claim that is an actionable tort under Florida law is Britton's

alleged battery (Count II).  AOL is indeed correct that the only actions AOL could have conceivably known about is Britton's propensity to ask female employees on dates or make comments about their appearance.  These acts are entirely different than a propensity to batter others.  Smith stretches the contours of Britton's prior acts in attempting to suggest that AOL should have known about Britton's potential for nefarious and intentionally tortious conduct.  However, on any view of the record, there is simply no evidence of Britton's propensity to batter others.  See Martinez, 422 F. Supp. 2d at 1298-99 (defendant employer's actual or constructive knowledge of employee's use of racial slurs is irrelevant and insufficient to put defendant on notice concerning the employee's propensity to assault or batter others). Thus, summary judgment is due to be granted in favor of AOL on Count III in the Amended Complaint.

### D.    Smith's Remaining Battery Claim (Count II)

As requested by plaintiff at oral argument and because the parties have fully developed this case for trial in this Court, the Court will exercise its discretion to maintain supplemental jurisdiction over plaintiff's battery claim against Britton.

### IV.    CONCLUSION

Defendant America Online, Inc. is entitled to summary judgment on Counts I and III in Plaintiff Katherine Smith's Amended Complaint.  Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.    Defendant America Online, Inc.'s Motion for Summary Judgment (Doc.

36) is **GRANTED**.

      2.    Defendant America Online, Inc.'s Motion to Strike Portions of Plaintiff's Response to America Online's Motion for Summary Judgment (Doc. 61) is **MOOT**.

      3.    By **June 14, 2007**, Plaintiff, Katherine Smith, must inform the Court whether she seeks to have the Court enter a Rule 54(b) Judgment so that she can immediately pursue an appeal against AOL (with the claim against Britton abated until the appeal is resolved), or whether she intends to proceed now to trial on the battery claim (Count II) against Chris Britton (leaving any appeal of the AOL ruling until after the trial against Britton).  After plaintiff so informs the Court, the Court will enter an appropriate Order or Judgment.[12]

      **DONE AND ORDERED** at Jacksonville, Florida this <u>25th</u> day of May, 2007.


TIMOTHY J. CORRIGAN
United States District Judge


t.
copies: counsel of record

---

[12]   If plaintiffs seek a Rule 54(b) certification, she must file a motion so requesting.

-28-